Michael W. LILLEY, Arthur Frederick, Vernon Agoyan, Bob H. Brown, Gregory J. Hampton, the Marilynne Brandon Hampton Trust, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs—Appellants,

v.

Stanley CHARREN; Maurice E. Miller; Joel Canino; Gerald R. Alderson; Kenetech Corporation; Charles Christenson; Angus M. Duthie; Steven N. Hutchinson; Howard W. Pifer, III; Mervin E. Werth; Mark J. Laskow, Defendants—Appellees,

J.P. Morgan Securities, Inc.; Merrill Lynch & Co.; Smith Barney, Inc.; Morgan Stanley & Co., individually and on behalf of a defendant Underwriter class, Defendants.

No. 99–16895.

D.C. No. CV–98–20416–JF.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 2001.

Decided Aug. 24, 2001.

Before CANBY, HAWKINS, and GOULD, Circuit Judges.

### MEMORANDUM *

Michael W. Lilley and other class representatives who were shareholders of Kenetech (collectively "Lilley") appeal the district court's grant of summary judgment to Defendants–Appellees Kenetech Corporation and selected directors, officers, and underwriters (collectively "Kenetech") under Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Act of 1934. Lilley alleges that Kenetech failed adequately to disclose in Kenetech's Initial Public Offering ("IPO") and Preferred Redeemable Increased Dividend Equity Securities ("PRIDES") prospectuses ("prospectuses") the risks associated with the Model 33M–VS wind turbine ("33M–VS"). Lilley argues that Kenetech's prospectuses contained false and misleading statements and projections regarding the 33M–VS.

Because the parties are familiar with the facts and the procedural history, we do not recite them herein except as may be necessary to understand our decision. In the mid–1980's, Kenetech determined that if wind energy could be produced for five cents per kilowatt hour ("5¢/kWh"), instead of the 7¢/kWh that was a preexisting production cost, wind energy would be able to compete with conventional energy sources. In 1988, Kenetech, in cooperation with the Electric Power Research Institute, began to develop a new generation turbine, Model 33M–VS wind turbine

("33M–VS"), to meet its 5¢/kWh goal. In mid–1993, after field tests, Kenetech began commercial production of the 33M–VS. In September 1993, Kenetech issued its IPO prospectus, which depicted the turbine's development and the company's goals and objectives about raising money for its new wind turbine. In April 1994, Kenetech issued the PRIDES prospectus for additional capital to be generated from sale of preferred stock and to disclose additional risks.

Both prospectuses explained that Kenetech had only begun to confirm the turbine's ability to produce power at 5¢/kWh over its expected life, and that there were risks involved. One of Kenetech's warnings stated:

> *New Product:* The future success of the Company is dependent on the technological and operational success of its newly-developed third-generation wind turbine, the Model 33M–VS. As is typical in the commercial development of any mechanical product, it is reasonable to anticipate that continued operation may reveal design or manufacturing deficiencies in the machine. In addition, as is also typical in the commercial development of any mechanical product, long-term operation of the Model 33M–VS may disclose that loads on the machine exceed those for which it was designed, resulting in materials fatigue failures that would affect future operation.

The prospectuses also disclosed that Kenetech anticipated technical problems, but that the company was confident in its ability to correct them.

On August 8, 1995, Kenetech announced a larger than anticipated loss of two cents per share. Thereafter, on September 28, 1995, Lilley brought this class action

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

against Kenetech. Lilley appeals the district court's grant of summary judgment in favor of Kenetech.

■ A section 11 action can be used to challenge false or misleading statements in a registration statement. For a section 11 action: Any person acquiring a security may sue, *inter alia*, (1) every person who signed the registration statement; (2) every person who was a director of or partner in the issuer ... if any part of the registration statement: (a) contained an untrue statement of material fact or (b) omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a).

■ A section 10(b) claim may challenge misrepresentation in more settings. To establish a section 10(b) action, Lilley has the burden of proving: (1) that Kenetech made a false statement or failed to disclose information that rendered another statement misleading; (2) that such statement or omission was material; (3) that Lilley relied on the statement or omission; and (4) that Kenetech acted with scienter or an intent to defraud. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996).

Any allegedly false or misleading statements must be considered in the context of both the comprehensive disclosures made by the company, *In re Worlds of Wonder Securities Litigation ("WOW")*, 35 F.3d 1407, 1413 (9th Cir.1994), and the extensive information in the market regarding the 33M–VS turbine and Kenetech's prospects. *Heliotrope Gen., Inc., v. Ford Motor Co.*, 189 F.3d 971, 976–78 (9th Cir. 1999).

We examine first whether there was a material issue of fact regarding whether Kenetech's prospectuses, registration statement, and other company disclosures contained false and misleading statements and projections under section 11 or section 10(b). This issue turns primarily on whether the statements of belief made by Kenetech were false or misleading. If no false or misleading statements were made, that is the end of the matter.

■ Our precedent suggests that we should consider several factors in assessing whether the statements were false or misleading. We weigh the following factors: First, we consider whether the statement was genuinely believed by the speaker. Second, we consider whether there was a reasonable basis for that belief. Third, we consider whether the speaker was aware of any undisclosed facts tending seriously to undermine the accuracy of the statement. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir.1996); *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989) (stating that forward-looking statements or statements of belief, made in good faith and with a reasonable factual basis, cannot form the basis of liability).

Considering the first factor, there can be little doubt that the declarations submitted by Kenetech from senior engineers support Kenetech's belief in the prospects of the machine, the company's future, the engineers' abilities to solve problems as they arose, and the accuracy of the prospectuses. We do not see any genuine issue of whether the company and its directors and officers had a subjective belief in accord with their statements.

Considering the second factor, there is ample testimony and documentation in the record showing a reasonable basis for challenged statements in the prospectuses predicting commercial viability and an ability to produce power at 5¢ kWh. This evidence includes the disclosures in the prospectuses regarding commercial introduction; the five-year development history and field tests of the turbine; presentations of senior engineering personnel to the Board; involvement of outside experts in the de-

sign and testing of the turbine; and the review and approval of specific language in the prospectuses by senior engineering personnel. Taken together, this evidence provides a reasonable basis for Kenetech's belief that the 33M–VS was a viable product.

On the other hand, Lilley vigorously contends that declarations it submitted raise an issue of material fact regarding the commercial viability of the 33M–VS, because some of Kenetech's employees knew and said the 33M–VS would not work, and that it could not produce the power at the competitive cost of 5¢ kWh. Lilley argues that a trial was necessary where competing versions of the facts could be weighed and decided.

■ However, while this argument has some weight, we think it was correctly answered by the district court, and on this issue we affirm substantially for the reasons stated by the district court in its order granting motions for summary judgment. It is true that there were some lower level employees who gave declarations asserting that the 33M–VS was not economically viable, did not adequately work, and encountered too many problems to reach the wind power cost goal necessary for economic viability. However, we agree with the district court that in any large corporation there will be differences of opinion expressed. The key fact that the district court found undisputed was that Kenetech reasonably relied on its senior engineering personnel, and that "no reasonable jury could find defendants' reliance unreasonable." This ruling does not, as Lilley contends, create a new "reliance" defense to misrepresentation; instead, it simply represents our settled law that looks to whether there was a reasonable basis for Kenetech's predictive statements of belief. Four senior engineers informed the Board that they believed the 33M–VS was ready for commercial release in mid–

1993. And an executive vice-president who investigated the status of the 33M–VS reported that on the basis of all the input he received, the machine was at least ninety percent ready for commercial production. We conclude that there was no genuine issue of material fact contradicting the reasonable basis for Kenetech's belief and statements regarding the possible commercial viability of the 33M–VS.

With regard to the third factor, the record does not show any material undisclosed facts that undermined Kenetech's statements in the prospectuses. Not only did the reports mentioned above provide a reasonable basis for Kenetech's belief, they also fail to show any undisclosed facts that would undermine the accuracy of Kenetech's statements.

We conclude that the district court correctly determined that there were no genuine issues of material fact regarding the allegedly false or misleading statements made by Kenetech.

■ Our conclusion is reinforced by the "bespeaks caution" doctrine that "provides a mechanism by which a court can rule as a matter of law ... that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *WOW*, 35 F.3d at 1413 (internal quotation marks and citation omitted). Our rule as expressed in *WOW* is applicable here.

The key statements attacked by Lilley were predictive and forward-looking in nature. These were:

The company believes that its newly-developed third generation wind turbine—the model 33M–VS, which is designed to produce power at 5¢ per kWh hour, is cost competitive with, and offers many advantages over, fossil fuel power generation.

[Kenetech] has developed and is producing wind turbines that it believes makes

608

the cost of wind generated electricity competitive with other generation alternatives for the first time.

The challenge to these statements under the securities laws fails because the prospectuses contained ample and comprehensive risk disclosures [1] revealing to all who read them that the company was counting on a new, advanced technology with a limited production history and substantial risks. It is clear to us that any investor reasonably should have recognized and anticipated the possibility that design and manufacturing deficiencies, economic developments, or other uncertainties affecting a novel technology might prevent the company from reaching its optimistic goals. Also, in addition to fairly disclosing the risks, Kenetech generally framed the affirmative language in the prospectuses in terms of what they "believed," rather than assertions of fact.

The prospectuses' affirmative forward-looking statements were hemmed in by sufficient cautionary language to avoid a fraud upon investors. The district court properly relied on *WOW*, and explained:

[V]irtually everything plaintiffs have identified as affirmative misrepresentations came couched in cautionary language and predictive language, with caveats. True, the representations were generally optimistic, but a company need not 'bad mouth' a product on which it is staking its future. Likewise, virtually everything plaintiffs have identified as an omission was in fact disclosed, although not always with the level of detail plaintiffs would have liked. . . .

Because investors know how to "devalue the optimism of corporate executives," the market is not misled by a company's enthusiastic and general predictive statements when circumscribed by explicit and ample cautionary risk disclosures. *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993).

■ Lilley did not raise a genuine issue of material fact regarding whether the prospectuses, registration statement, or other company disclosures contained misleading or false statements.[2] To the contrary, the prospectuses, registration

---

1. Examples of the risk disclosures contained in the prospectuses include: "[T]he future success of the Company is dependent on the technological and operational success of its newly developed third generation wind turbine, the Model 33M–VS;" "[t]he future success of the Company is dependent on its ability to increase capacity to manufacture and deliver its Model 33M–VS wind turbines on a timely and sustained basis, and at an acceptable cost;" "[i]n addition, many potential customers believe that wind energy is an unpredictable and inconsistent resource, is uneconomic compared to other sources of power, and does not produce power of suitable quality;" there is a learning curve applicable to new products; windplants are "large and complex" projects with two-plus year development cycles, and each step "involves significant risks, including the risk of delay;" "[t]he Company's ability to establish windpower as a generally accepted utility technology is dependent on the Company's and/or its customers' ability to develop suitable sites;"

financial institutions have a limited willingness to invest in windpower projects; there are risks in the rapid anticipated ramp-up of manufacturing from 100 machines in 1993, to 500 in 1994, to 1,100 in 1995; if regulation of the utility industry changed, it could affect Kenetech's market opportunity; and there could be environmental challenges to certain of the anticipated projects.

2. Lilley's section 10(b) claims would also fail for lack of scienter. *In re Stac Elecs.*, 89 F.3d at 1404. A company's "massive investment in [its new product] demonstrates ... good faith." *In re Apple Computer*, 886 F.2d at 1117. Kenetech's conduct was inconsistent with an inference of scienter. Kenetech continued to make, market, and improve the 33M–VS throughout the class period, investing money. Kenetech sought and obtained multiple suppliers for its component parts to ensure sufficient inventory. Kenetech hired new employees and contracted with its primary blade manufacturer to invest in a new

statements, and other company disclosures contained predictive statements genuinely believed by Kenetech and also had adequate cautionary language and risk disclosures. The district court properly granted summary judgment in favor of Kenetech on the section 11 and section 10(b) claims.[3]

AFFIRMED.

factory to produce more blades. Kenetech proceeded with plans to acquire a multi-million dollar facility in Texas to produce more turbines. All these actions refute any inference of scienter. Further, there was no evidence of suspicious stock sales. Indeed, most of the defendants continued to hold their stock throughout the class period; while some even purchased additional shares during the class period.

3. Because we have determined that the district court properly granted summary judgment to Kenetech on the section 11 and section 10(b) claims, we do not reach Kenetech's remaining arguments in support of summary judgment—loss causation and "truth of the market" defense. We also do not reach the standing issue raised by Lilley regarding the aftermarket purchase of securities.

